UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

Plaintiff,

-against-

ONE ETCHED IVORY TUSK OF AFRICAN
ELEPHANT (LOXODONTA AFRICANA),

Defendant,

-and-

GRAHAM KENT FULLER,

Claimant.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**
**10-CV-308 (NGG) (SMG)**

NICHOLAS G. GARAUFIS, United States District Judge.

The United States brings this in rem action against one etched ivory tusk of African

elephant (Loxodonta Africana) ("Defendant Tusk" or "the Tusk"), seeking its forfeiture and

condemnation (Compl. (Docket Entry # 1) at 11.) Graham Kent Fuller ("Claimant") has put

forward a claim for the Tusk, alleging that he is its owner. (Cl. (Docket Entry # 4) at 1.)

Claimant has moved to dismiss the Complaint for failure to state a claim upon which relief can

be granted and for summary judgment. (Clt. Mot. to Dismiss & Mot. for Summ. J. (Docket

Entry 29).) The United States has cross-moved for summary judgment. (Gov't Mot. for Summ.

J. (Docket Entry # 31).) When the two motions were fully briefed, the court heard oral argument

from both parties. (See Apr. 8, 2011 Minute Entry.)

Upon due consideration, the court GRANTS summary judgment to the United States and

DENIES Claimant's motion to dismiss and for summary judgment.

1

## I. BACKGROUND

The material facts of this case are undisputed.[1] On April 11, 2007, Claimant killed an African elephant during a sport hunt in Zimbabwe, pursuant to a license issued by Zimbabwe's Parks and Wildlife Management Authority. (Clt. 56.1 Stmt. (Docket Entry # 29-2) ¶¶ 1-2.) Claimant cut the elephant's two tusks and some of its skin from its corpse, and delivered them to a taxidermist, Dudley Rogers, for preparation. (Id. ¶¶ 3-4; Gov't Mem. Ex. 7 ("Martynenko Decl.") ¶¶ 5, 8; Gov't Mem. Ex. 3 ("Cl.'s CITES Export Permits").) As part of this preparation, Claimant directed Rogers to scrimshaw a scene of Africa's "Big Five" game animals[2] on one of the tusks; specifically, Defendant Tusk, which is marked with the unique identification code ZW2007-23032. (Clt. 56.1 Stmt. ¶ 5; Fuller Decl. (Docket Entry # 29-3) ¶ 3.) The scrimshaw work was completed in mid-June 2007. (Clt. 56.1 Stmt. ¶ 6.)

In or about June 2009, two years after Defendant Tusk was scrimshawed, Claimant obtained permits from the Zimbabwe Parks and Wildlife Management Authority to export two tusks, including Defendant Tusk, and seven pieces of elephant skin, from Zimbabwe to the United States. (See Clt.'s CITES Export Permits; Clt. 56.1 Stmt. ¶ 7.) These specimens were imported to the United States on July 30, 2009. (Gov't 56.1 Stmt. (Docket Entry # 30-1) ¶ 22; Kochman Aff. (Docket Entry # 29-8) ¶ 4; Kochman Aff. Ex. B (Docket Entry # 29-10) ("Notice of Seizure").) Shortly after their arrival in the United States, the tusks were physically inspected by Fish and Wildlife Service ("FWS") Inspector Michael Martynenko on August 17, 2009.

---

[1]    The parties do disagree on exactly how one should characterize the work that has been done to Defendant Tusk: the United States labels the work "scrimshawing" and offers evidence of the difficulty and artistry that the work required (Gov't Mem. (Docket Entry # 30) at 20-22), while Claimant labels the work "pencil etching" and emphasizes that the work is only millimeters deep (Clt. Mem. (Docket Entry # 29.1) at 11). However, this is not a dispute as to material facts: regardless of the name of the type of work, or its quality or depth, there is no dispute that the Tusk has been changed from its natural state through an etching process, and this fact is the relevant one to the legal issues the case presents.

[2]    According to the United States, "the 'Big Five' African game animals refers to the elephant, cape buffalo, rhinoceros, male lion, and leopard, which are traditionally hunted on African safaris." (Gov't Mem. (Docket Entry # 30) at 2 n.4; Gov't 56.1 Stmt. (Docket Entry # 30-1) ¶ 24.)

(Martynenko Decl. ¶¶ 3-4, 11.) Inspector Martynenko observed that the tusk was "etched with the design of the 'Big-Five' African game animals." (Id. ¶ 11.) On August 18, 2009, Inspector Martynenko contacted Claimant, who stated that "he used an artist in Zimbabwe to 'etch' Defendant Tusk." (Id. ¶ 12.) Inspector Martynenko concluded that Defendant Tusk did not qualify as a sport-hunted trophy within the meaning of 50 C.F.R. § 23.74(b), and therefore could not be lawfully imported into the United States. (Id. ¶ 13.)

On August 20, 2009, the FWS seized Defendant Tusk. (Id. ¶ 14.) On September 8, 2009, William Anderson, Resident Agent in Charge of the FWS Office of Law Enforcement's Valley Stream, New York office, issued a Notice of Seizure and Proposed Forfeiture to Claimant. (Notice of Seizure at 1.) The Notice of Seizure stated that the FWS had determined that Defendant Tusk was subject to forfeiture under provisions of the Endangered Species Act and its implementing regulations. (Id. at 1-2.) The Notice of Seizure advised Claimant that he had the right to petition the FWS for remission of forfeiture, or to file a claim with the FWS, which would cause the FWS to contact the U.S. Attorney's Office to file a civil complaint for judicial forfeiture. (Id. at 2-3.) It further stated that, if Claimant took no action, the FWS would initiate administrative forfeiture proceedings. (Id. at 2.)

On October 26, 2009, the FWS received Plaintiff's claim requesting judicial forfeiture proceedings. (Compl. ¶ 40.) On January 25, 2010, the Government filed this in rem Complaint against Defendant Tusk.

## II.    CLAIMS FOR RELIEF

The Complaint alleges that Claimant imported Defendant Tusk into the United States in violation of the Endangered Species Act (the "ESA"), 16 U.S.C. § 1531 et seq., and the African Elephant Conservation Act (the "AECA"), 16 U.S.C. § 4201 et seq. (Compl. ¶ 2.) Counts One

3

and Two of the Complaint allege that Claimant imported Defendant Tusk into the United States without a permit for the export (Count One) or the import (Count Two) of a species listed on Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), and the Tusk is thus subject to forfeiture under 16 U.S.C. § 1540(e)(4)(A). (Compl. ¶¶ 42-51.) Count Three alleges that the Defendant Tusk is an African elephant specimen, listed as a threatened species under the ESA, see 16 U.S.C. § 1538(a)(1)(G), and was imported into the United States in violation of the Special Rule for African elephants, see 50 C.F.R. § 17.40(e)(2), because no exception to the prohibition on the import of African elephants applies, and is thus subject to forfeiture under 16 U.S.C. § 1540(e)(4)(A). (Compl. ¶¶ 52-60.) Count Four alleges that Defendant Tusk was imported in violation of the moratorium on the importation of all ivory issued by the FWS under 16 U.S.C. §§ 4222 and 4223(5), and fails to qualify for the exception for sport-hunted trophies under § 4222(e), and is thus subject to forfeiture under 16 U.S.C. § 1540(e)(4)(A) and § 4224(e). (Id. ¶¶ 61-65.)

## III.  DISCUSSION

### A.  Standard of Review

A motion for summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). Further, the burden of showing the absence of any genuine dispute as to a material fact rests on the movant. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if

4

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. A grant of summary judgment is proper "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994).

## B.    CITES, the ESA, the AECA, and Regulations promulgated thereunder

In 1975 the United States ratified and proclaimed its agreement to CITES. 27 U.S.T. 1087, 1089 (entered into force July 1, 1975), available at www.cites.org/eng/disc/text.php. CITES was intended to provide a means of "international cooperation . . . for the protection of certain species of wild fauna and flora against over-exploitation through international trade." CITES Preamble. CITES pursues this objective by creating different levels of regulation of international trade in plants and animals included on one of three lists: Appendix I lists species that are threatened with extinction, Appendix II lists species that may become threatened with extinction unless trade in specimens is subject to strict regulation, and Appendix III lists species the exploitation of which a party believes should be regulated and the party needs the cooperation of other parties. See CITES Art. II. Regulation of international trade is particularly strict for Appendix I species, moderately strict for Appendix II species, and relatively lax for Appendix III species. See CITES Arts. III-V. CITES requires states to make certain findings

before issuing export or import permits for species listed on the Appendices. Id. CITES requires states to designate a national Management Authority and a national Scientific Authority to make the required determinations. CITES Art. IX. The Convention's regulatory scheme is, however, only a floor for conservation efforts; CITES explicitly guarantees the rights of adhering states to enact stricter regulations of trade, or to prohibit outright trade in any species. See CITES Art. XIV.

Species are added and removed from Appendices I and II according to the provisions of CITES, which require the vote of two-thirds of the parties to amend a listing. CITES Art. XV. The categorization of the African elephant under CITES is not a model of clarity. It classifies the species as an Appendix I species, see CITES App. I, except for the elephant populations of Botswana, Namibia, South Africa, and Zimbabwe, see CITES App. II. However, that latter classification is governed by an annotation, which specifies that specimens from those populations are considered specimens from Appendix II species only if they are crossing international borders for one of several specific purposes, importantly for this case including "trade in hunting trophies for non-commercial purposes." CITES App. II Annotation 5(a). If a specimen is being traded for any purpose other than the listed ones, it is to be treated as a specimen from an Appendix I species. App. II Annotation 5. CITES does not define what constitutes a "hunting trophy."

No provision of CITES indicates that the treaty is "self-executing." See Medellin v. Texas, 552 U.S. 491, 504-05 & n.2 (2008). The United States incorporated CITES into domestic law through the ESA in 1973. See 16 U.S.C. § 1531(a)-(b) ("The purposes of this chapter are . . . to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section."); see also id. § 1537a(a) (designating the Secretary of

the Interior, through FWS, to carry out the functions of Management Authority and Scientific Authority under CITES). The ESA prohibits "any person subject to the jurisdiction of the United States" from "engag[ing] in any trade in any specimens contrary to the provisions of [CITES], or [] possess[ing] any specimens traded contrary to the provisions of [CITES]." Id. 1538(c) (1). The ESA also authorizes the Secretary of the Interior to promulgate regulations to enforce CITES and other provisions of ESA. Id. § 1540(f).

The FWS has promulgated extensive regulations to implement CITES in domestic law. See generally 50 C.F.R. §§ 23.1-23.92. One such regulation is 50 C.F.R. § 23.74, which governs international trade in personal sport-hunted trophies. In relevant part, the regulation states that "the import, export, or re-export of sport-hunted trophies of species under CITES must meet the requirements of this section." 50 C.F.R. § 23.74(a). The section defines a sport-hunted trophy as:

> raw or tanned parts of a specimen that was taken by a hunter, who is also the importer, exporter, or re-exporter, during a sport hunt for personal use. It may include the bones, claws, hair, head, hide, hooves, horns, meat, skull, teeth, tusks, or any taxidermied part, including, but not limited to, a rug or taxidermied head, shoulder, or full mount. It does not include articles made from a trophy, such as worked, manufactured, or handicraft items for use as clothing, curios, ornamentation, jewelry, or other utilitarian items.

Id. § 23.74(b) (emphasis added).

The ESA does more than simply implement CITES; it also gives the Secretary of the Interior the duty of determining whether any species is endangered or threatened with extinction, and to then promulgate "such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(a)(1), (d). A species may be categorized as endangered or threatened under the ESA without regard to whether it is an Appendix-I or Appendix-II species according to CITES. Sections 1538(a)(1) and (a)(2) explicitly prohibit any

7

person subject to the jurisdiction of the United States from importing any endangered or threatened species into the United States without a permit issued by the Secretary under the authority of section 1539(a). The African elephant is classified as threatened under the ESA. See 50 C.F.R. § 17.11.

The ESA creates a statutory presumption that the non-commercial importation of a specimen from an Appendix-II listed species that is not on the endangered species list, made in compliance with all of CITES' requirements, does not violate the ESA or the regulations issued pursuant to it (if several other criteria are met).[3] 16 U.S.C. § 1538 (c)(2).

Both the statutory presumption and the exceptions to it are the subject of regulations issued by the FWS. The FWS has promulgated a general rule that a specimen of a threatened, CITES Appendix II species may be imported without a threatened species permit if it was not imported for commercial purposes and otherwise follows the regulations the FWS has promulgated for the importation of CITES-listed specimens, unless the FWS has created a special rule for that species. See 50 C.F.R. § 17.8(b). The FWS has promulgated special rules for several species where it found those species need additional protection and that therefore rebut the statutory presumption that an importer need only follow the CITES regulations.

The AECA amended the ESA to address issues specific to African elephants. The AECA directs the United States government to establish a moratorium on the importation of ivory from any nation that the United States finds does not follow a set of statutory criteria. 16 U.S.C. § 4222(a-b). However, the statute also clarifies that the United States cannot impose a moratorium on "sport-hunted trophies" if those trophies have been taken legally in ivory-

---

[3] Both the United States and Claimant refer to this provision of the ESA as a provision protecting sport-hunted trophies. (Gov't Mem. at 52; Clt. Reply Mem. (Docket Entry # 32) at 8-11.) However, the text of the statute does not reference trophies explicitly. One piece of legislative history does ascribe to this provision the goal of permitting the importation of trophies taken in other countries. 119 Cong. Rec. 30,163 (1973) (floor statement of Congressman John Dingell).

producing nations that have submitted ivory quota information to the United States. Id. § 4222 (e). The AECA does not define "sport-hunted trophy." The statute authorizes the United States to enforce its provisions in the same manner as it enforces the ESA. Id. § 4224(e).

The FWS has promulgated a special rule for the African elephant species that rebuts the ESA's presumption that following CITES' requirements is sufficient to protect the species. See generally Listing of the African Elephant as a Threatened Species, 43 Fed. Reg. 20499-504 (May 12, 1978) (finding that the species faces several pressures on its population and existing conservation measures, including CITES, did not sufficiently protect it, justifying a special rule establishing additional conservation measures). The rule also enforces the AECA's moratorium on ivory importation and its exception for sport-hunted trophies. 50 C.F.R. § 17.40 (e)(2). The trophy exception allows the importation of sport-hunted trophies if the trophy originates from a nation that has supplied the FWS with information on its yearly ivory quota, and "all of the permit requirements of 50 CFR parts 13 and 23 [the regulations implementing CITES] have been complied with, [and] a determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species[,]" and the trophy is marked in certain specified ways. [4] Id. § 17.40 (e)(3)(iii). Section 17.40(e) does not define "sport-hunted trophies."

The ESA provides for the forfeiture of wildlife imported or possessed contrary to the ESA or regulations promulgated pursuant to it. 16 U.S.C. § 1540(e)(4)(A). 18 U.S.C. § 983(c)(1) assigns the burden of proof in civil forfeiture actions to the United States government.

---

[4]      Aside from the hunting trophy provisions, the regulation promulgates a general ban on the import of ivory, except for antique ivory and ivory that had been exported from the United States and is being re-imported. 16 C.F.R. § 17.40(e)(3)(ii)(A).

## C.   Application

Although Claimant raises a variety of arguments, the primary issues that both United States' and Claimants' motions present are whether the FWS had discretion to promulgate a rule defining "sports-hunted trophy" or "hunting trophy" for the purposes of CITES, ESA, and AECA, and, if the answer to the first question is yes, whether Defendant Tusk fits the definition the FWS promulgated in 50 C.F.R. § 23.74(b). The court will address these core issues first in its discussion of the cross-motions for summary judgment; it will then turn to Claimant's remaining arguments—concerning the presumption of importability under ESA, the innocent owner defense, notice of the AECA claim, retroactivity, vagueness, and due process—and an issue the court raises sua sponte—the Act of State doctrine—subsequently.

### 1.   Cross-Motions for Summary Judgment

Pursuant to Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984), the first issue the court must resolve is "whether Congress has directly spoken to the precise question at issue" and "unambiguously expressed [its] intent" on what constitutes a hunting trophy. See also Linares Huarcaya v. Mukasey, 660 F.3d 224, 228 (2d Cir. 2008). CITES did not define what a hunting trophy was when the United States signed and ratified it—indeed, the original text of CITES did not use the term. CITES Article I, the article which defines various terms used in the convention, does not include this term. The provisions of ESA that incorporate CITES into domestic law do not add greater clarity to the definitions contained in CITES: "it is unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention . . . including the definition of terms in article I thereof." 16 § 1538(c)(1). The provision of ESA that creates the presumption of importability for specimens of non-endangered, Appendix II

10

animals imported for non-commercial reasons does not provide any more precise evidence of Congressional intent—like the original text of CITES, it does not use the term "sport-hunted trophy." See Id. § 1538(c)(2). Annotation Five to Appendix II does use the term "hunting trophy", but does not define it. The AECA, 16 U.S.C. § 4222(e), uses the term "sport-hunted trophy" but does not define it either.

The parties offer two citations to legislative materials that refer to sport-hunted trophies. One member of Congress offered a floor statement in support of the ESA in which he argued that § 1538(c)(2) would permit lawfully taken trophies to be imported into the United States; however, he did not offer a definition of "sport-hunted trophies." 119 Cong. Rec. 30, 163 (1973) (floor statement of Congressman John Dingell). The only piece of legislative material to which the parties cite that defines sport-hunted trophy is a House of Representatives Committee Report that discusses the term in the context of polar bears. The report describes trophies as "the hide, hair, skin, teeth, and class of the animal, that can be used by a taxidermist to create a mount . . . or tanned for use as a rug." H.R. Rep. No. 103-439 (1994).

Claimant offers two additional methods of determining whether the meaning of sport-hunted trophy has been congressionally determined. The first is that the term is "self-defining," i.e., a "sport-hunted trophy is one taken while sport hunting, whatever form the trophy may ultimately take." (Clt. Reply Mem. at 15-16.) Under Claimant's line of reasoning, Congress meant that anything that someone takes from a hunt is a trophy. There is no evidence for this claim, beyond the use of the words "sport-hunted trophy," and there are several problems with it.[5] The first is that, if that were Congress's intent, it could have expressed it simply and clearly by simply permitting the importation of any specimen taken from an animal killed at a hunt,

---

[5]     Claimant's use of the community-edited website Wikipedia for a definition of the term "intentional definition" is not an acceptable method of providing authority in a legal brief. (See Clt. Reply Mem. at 15-16.)

rendering the use of the word "trophy" unnecessary. The second problem with Claimant's argument is that it would render unnecessary the legislative report's reference to taxidermied parts for a mount and tanned skins for a rug—both of those types of items would be a subset of the greater category of anything that someone might take from a hunt, and so there would be no need for that explicit reference. The third problem is that the definition Claimant proposes is actually no definition at all—trophy would be a concept dictated entirely by the subjective values of individual importers. This reading of the word trophy could permit a great many actions that might undermine the conservation regime Congress has created—e.g., bush meat could be considered a trophy by some, an outcome that might undermine efforts to deter black markets in the flesh of threatened animals. The court considers these obvious problems sufficient reasons to believe that Congress did not specifically intend the definition that Claimant proposes.

Claimant also argues that the definition of sport-hunted trophy has been determined by a recent resolution of the parties to CITES. See CITES Parties Conference Resolution 12.3, as revised by Conference of the Parties 15, available at http://www.cites.org/eng/res/12/12-03R15.php. A conference of the parties to CITES adopted a definition of "hunting trophy" as "a whole animal, or a readily recognizable part or derivative of an animal . . . that [] is raw, processed or manufactured." Id. I(h)(i). Claimant argues this definition is now the agreed-upon definition of the term sport-hunted trophy. (Clt. Mem. at 4-5.)

Claimant's citation to the resolution does not help his claim. Claimant does not provide authority to support the proposition that resolutions of parties to a treaty are binding on the parties even as a matter of international law (when those resolutions are not styled as amendments to the treaty and adopted through the treaty amendment procedure). In any case, the United States is a dualist nation, and even instruments that bind it at the international level

12

are not binding as a matter of domestic law unless those instruments are self-executing or Congress takes an action to incorporate them into domestic law. See Medellin, 552 U.S. at 504-05 & n.2. The resolution does not pass under either test, and so is not binding as a matter of domestic law. Therefore, the court will not apply its definition of sport-hunted trophy to this case.

Although a single legislative report is fairly weak evidence of legislative intent, the court assumes, without deciding, that Congress intended hunting trophies to include, at least, taxidermied parts and tanned hides. However, there is no indication that Congress considered whether specimens that have been worked in any other way should qualify as sport-hunted trophies. The court concludes that the term is ambiguous or vague in a manner that gives the executive branch discretion to interpret it; the court proceeds to the second step of determining whether the agency's interpretation of the term is reasonable. See Chevron, 467 U.S. at 845; Linares Huarcaya, 550 F.3d at 228.

> The FWS has promulgated a rule that defines "sport-hunted trophy" as:
>
> raw or tanned parts of a specimen that was taken by a hunter, who is also the importer, exporter, or re-exporter, during a sport hunt for personal use. It may include the bones, claws, hair, head, hide, hooves, horns, meat, skull, teeth, tusks, or any taxidermied part, including, but not limited to, a rug or taxidermied head, shoulder, or full mount. It does not include articles made from a trophy, such as worked, manufactured, or handicraft items for use as clothing, curios, ornamentation, jewelry, or other utilitarian items.

50 C.F.R. § 23.74(b) (emphasis added).[6] This definition of trophy includes taxidermied and tanned specimens—thereby allowing for mounts and rugs, the two types of items that the

---

[6] Claimant alleges that § 23.74(b) was not promulgated according to the requirements of the APA. (Clt. Mem. 21-22.) Claimant argues that the rule should have been noticed and then re-noticed ninety days later. (Id.) Claimant does not cite to any provision of the APA that requires this; on the contrary, the general provisions for rule-making according to the APA call for a thirty-day period between notice and application. 5 U.S.C. § 553. Claimant appears to be referring to 16 U.S.C. § 1533(b)(5), which requires a ninety-day publication period if the FWS proposes to list a species as endangered or threatened. As § 23.74(b) did not change the status of the African

legislative history suggests Congress intended to be trophies. The definition excludes items that have been altered in ways other than those processes. As the FWS explains, this exclusion is reasonable for at least two reasons. The first is that it serves the policies of CITES and the ESA by excluding items that could supply an illegal market for things such as ivory jewelry or curios. (Gov't Mem. at 13.) Discouraging markets in such goods is one way of reducing pressure on various threatened species. (Id.) The second reason is that the definition creates a bright-line rule that is easily enforceable by customs agents so that items that harm conservation efforts can be detected and excluded, while items that bolster conservation are permitted to pass into the country. (Id. at 14.)

The court cannot fault the adopted definition of sport-hunted trophy. It includes the categories of items about which Congress has arguably expressed an intent, and excludes other items based on logical connections to the policies that animate the relevant Congressional enactment. Regardless of whether this is the definition that the court, or an individual, might apply to "trophy," the court concludes that the FWS's definition is reasonable and clearly within the realm of the FWS's interpretative discretion. Chevron, 467 U.S. at 865-66; Linares Huarcaya, 550 F.3d at 228.

Having determined that CITES, the ESA, and the AECA each leave ambiguity over the definition of "sport-hunted trophy" and that the FWS's definition of that term is a reasonable one, the court next considers whether the definition promulgated applies to all of the provisions of the ESA (e.g., the provisions governing the trade of species listed as threatened or endangered pursuant to ESA's requirements) and the AECA (which provides additional protection to African

---

elephant—it has been a threatened species since before the promulgation of that rule—the FWS had no reason to follow the provisions of 16 U.S.C. 1533(b)(5) in promulgating the rule.

Elephants), or only to CITES.[7] The general requirements for importation of specimens from species listed as threatened under the ESA are contained in 50 C.F.R. § 17.8, which requires, inter alia, that "the species [must be] listed in Appendix II of [CITES] [and] the specimen [must be] imported and subsequently used in accordance with the requirements of part 23 of this subchapter . . . ." 50 C.F.R. § 17.8(b)(2-3). This provision incorporates by reference the regulations that the FWS has promulgated (in part 23) for the importation of specimens regulated by CITES; thus, the definition of sport-hunted trophy in § 23.74 also applies to threatened species under the ESA.[8]

The FWS has promulgated a special rule for African elephants that both enforces the provisions of the AECA and rebuts the general presumption of importability for threatened species under the ESA. See 50 C.F.R. § 17.40(e). However, nothing in § 17.40(e) suggests that a specimen that qualifies for importation under its terms need not meet the general rules established in § 17.8. On the contrary, § 17.40(e) adds additional restrictions for African elephant specimens onto what § 17.8 already requires for all threatened species, without eliminating those general restrictions. The incorporation by reference of the CITES regulations in § 17.8 also applies to the special rule that enforces the AECA; thus, the definition contained in

---

[7] It is pellucid that § 23.74 applies to CITES. The regulation itself states that "import, export, or re-export of sport-hunted trophies of species listed under CITES must meet the requirements of this section." 50 C.F.R. § 23.74(a). Moreover, the regulation was promulgated in 50 C.F.R. Part 23, which is entitled "CITES" and contains the regulations implementing the treaty; finally, when the proposed regulation was published for notice and comment in the Federal Register, and again when it was published as a final regulation, it was titled "Revision of Regulations for CITES." 71 Fed. Reg. 20168, 20256; 72 Fed. Reg. 48402, 48491.

[8] The United States notes that the history of § 23.74 further demonstrates the intent of the FWS for its definition of sport-hunted trophy to apply to species regulated under the ESA; it notes that the initially proposed version of § 23.74 was accompanied by a proposed § 17.8(e), which contained an identically-worded definition of "sport-hunted trophy." See 65 Fed. Reg. 26664, 26685. Section 17.8(e) was not adopted. However, in the final notice of § 23.74, the FWS noted that "proposed section [17.8] no longer defines 'sport-hunted trophy.' Instead, it requires that a specimen meet the provisions of 50 C.F.R. part 23, which defines the term." 71 Fed. Reg. 20168, 20170. The court notes that retention of the proposed § 17.8(e), while not necessary, would have given greater clarity to the regulatory regime.

15

§ 23.74 also applies to the sport-hunted trophy provision in the special rule (which in turn enforces the sport-hunted trophy provision in AECA).[9]

In addition to the incorporations by reference that the court describes above, the court notes that two specific aspects of the relationship among these three enactments reinforce the conclusion that a single definition of sport-hunted trophy applies to all three: the first is that the FWS interprets and enforces all three enactments, and the second is that CITES creates a minimum floor of protection while the ESA and its amendments provide for additional, greater protections for certain wildlife as needed. It would be a remarkably incoherent state of affairs if FWS applied different definitions of sport-hunted trophy, depending on whether it was acting pursuant to CITES or the ESA. It would also be remarkably illogical for Congress and the FWS to intend greater protections for the African elephant but strip out the minimum protections that are given to the species under CITES. These observations reinforce the regulatory cross-references discussed above, and the court concludes that the definition of sport-hunted trophy contained in § 23.74 applies to actions under the ESA and the AECA as well as under CITES.

The last issue to consider is whether the FWS's decision that Defendant Tusk did not meet its definition of a sport-hunted trophy was erroneous. An agency's interpretation of its own regulations are "controlling unless plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997). Claimant argues that the regulatory definition of sport-hunted trophy, when read properly, does not exclude a tusk that is whole and altered only in part. (Clt. Mem. at 15-17.) Certainly, one could read the clause "[i]t does not include articles made from a trophy, such as worked, manufactured, or handicraft items," 50 C.F.R. § 23.74(b), as prohibiting the importation of an article only if the underlying specimen has been completely

---

[9]     The court also notes that the special rule explicitly states that a specimen must meet "all of the permit requirements of 50 CFR parts 13 and 23," thus further implicitly incorporating the regulations promulgated in part 23 such as § 23.74.

transformed into a different physical structure, e.g., a tusk that had been broken and its shards shaped into chess pieces. On the other hand, one could read the sentence as prohibiting any item that was a trophy and has been "worked, manufactured, or [turned into] a handicraft;" that is, any item taken in a hunt and then altered or enhanced through human labor. Either interpretation of the quoted sentence is a possible and reasonable one. In choosing between these two interpretations, the court's authority is not unrestrained: "it is axiomatic that the agency's interpretation need not be the best or most natural one by grammatical or other standards[;] [r]ather the agency's view need be only reasonable to warrant deference." Linares Huarcaya, 550 F.3d at 229 (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991)). When viewed in this deferential light, the court concludes that the agency's reading of the regulation— i.e., that it prohibits importation of specimens that have been altered or enhanced by human labor—must prevail.

Having concluded that Defendant Tusk has been reasonably classified as not a trophy as reasonably defined by the FWS, Defendant Tusk is legally considered a specimen of an Appendix I species, not an Appendix II one. See Appendix II Annotation 5. Therefore, there is no genuine issue as to any element of the claims the United States raises under CITES. (See Compl. First & Second Claims for Relief.) Moreover, as a specimen that is not a trophy, there is no genuine issue as to any element of the claims the United States raises under the ESA, the AECA, and the special rule for African elephants. (See id. Third & Fourth Claims for Relief.) The United States is entitled to judgment as a matter of law, unless one of Claimant's additional arguments or the Act of State doctrine bars the United States' claims.

17

## 2. Claimant's additional arguments

Claimant argues that he is protected by 16 U.S.C. § 1538 (c)(2), a provision of the ESA that creates a presumption of lawfulness where someone imports a specimen of a threatened, Appendix II-listed species in compliance with CITES' provisions. Claimant's argument fails for two reasons. The first is that Defendant Tusk is not an Appendix II-listed species. Annotation Five specifies that specimens of African elephants from Zimbabwe are considered to be from an Appendix II species only if they qualify as hunting trophies; otherwise, they are to be treated as specimens of an Appendix I species. Appendix II Annotation 5. As discussed above, FWS reasonably defined the previously undefined term "sport-hunted trophy" for CITES purposes in a way that does not include Defendant Tusk; therefore, the Tusk is considered a specimen from an Appendix I species, not an Appendix II one. Therefore, the statutory presumption is simply inapplicable to the Tusk.

The second reason is that the FWS has rebutted the presumption by a rule-making that considered the special dangers that African elephants face. See Listing of the African Elephant as a Threatened Species, 43 Fed. Reg. 20499-504 (May 12, 1978) This rule-making determined that additional conservation measures were needed beyond what CITES provided. Id. Therefore, even if Tusk were considered a specimen of an Appendix II species, Claimant could not rely on the presumption because that presumption has already been rebutted.

Claimant's next argument is that he qualifies as an "innocent owner" under 18 U.S.C. § 983(d)(1). This provision prohibits the seizure of a property interest if the claimant can prove he is an innocent owner. To do so, he must show that he "did not know of the conduct giving rise to the forfeiture" or that, "upon learning of the conduct giving rise to the forfeiture, [he] did

18

all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A)(i-ii).

Claimant's attempt to invoke the innocent owner protection fails because of another provision of the same statute. 18 U.S.C. § 983(d)(4) clarifies that the innocent owner provision does not apply where the interest is in a property that is "contraband or other property that it is illegal to possess." Defendant tusk is of course property that is illegal to possess—it is something that cannot legally be brought into the United States. Therefore, the innocent owner defense is statutorily preempted.[10]

Claimant also argues that the United States' Fourth Claim for Relief, seeking seizure for violation of the AECA, should be dismissed because the initial Notice of Seizure Claimant received did not refer to the AECA. (Clt. Mem. at 20-21.) Claimant cites provisions within the Code of Federal Regulations that require the FWS to give a property owner notice of the reasons for a property's detention and seizure. See 50 C.F.R. §§ 14.53(a), 12.11.

Claimant's argument is unavailing for multiple reasons. First, the Notice of Seizure gave sufficient notice of the reason for the seizure of the Tusk to Claimant: the United States believes the Tusk is not a trophy. Second, the cited provisions of the Code of Federal Regulations do not by their terms mandate that a complaint, or a claim under the complaint, must be dismissed if a court finds that the required pre-litigation notice had not been given. Moreover, Claimant does not cite to any examples of courts enforcing the regulations in that way. Third, courts have

---

[10]     Claimant raises for the first time in his reply brief an argument that the seizure of Defendant Tusk is constitutionally excessive, and cites 18 U.S.C. § 983(g)(1), which permits a claimant to petition the court for a determination of whether a seizure is excessive. (Clt. Reply Mem. at 21-22.) Section 983(g)(1) mandates that in such a petition, "claimant shall have the burden of establishing that the forfeiture is grossly disproportional by a preponderance of the evidence." The only evidence that is in the record about the value of the Tusk is Claimant's sworn statement that the value of the tusk is $50.00. (Clt. Wildlife Decl. (Gov't Ex. 23) at Box 19b, Row 2.) Even assuming that Claimant is being punished for an offense—a characterization that the United States vigorously disputes (see Gov't Mem. at 42-44; Gov't Reply Mem. at 9-10)—Claimant offers no evidence that the loss of a $50.00 tusk is disproportional to the offense of violating ESA's conservation regime.

allowed the United States to amend complaints seeking the seizure of property, see, e.g., United States v. U.S. Currency in the Amount of $ 146,800, No. 96-CV-4882, 1997 WL 269583, at *6-8 (E.D.N.Y. 1997); see also Fed. R. Civ. P. 15(a)(2) ("the court should freely give leave [to amend] when justice so requires"), and the court can see no reason why the United States should be prohibited from adding an additional basis for seizure before filing a complaint, if it can amend a complaint to add additional claims after filing.

Claimant's remaining three arguments sound in constitutional due process protections. The first of these is that the FWS is retroactively enforcing § 23.74 by applying it to Defendant Tusk, which had been etched in the first half of 2007, before § 23.74 came into force. (Clt. Mem. at 13-15; see also Fuller Decl. ¶ 3.) Claimant cites Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994), for the test of when an enactment is acting retroactively: when it is "impair[ing] rights a party possessed when he acted, increas[ing] a party's liability for past conduct, or impos[ing] new duties with respect to transactions already completed." Under this test, Claimant submits, the 2009 seizure of the Tusk is an unconstitutionally retroactive application of a regulation promulgated after the Tusk was etched.

Claimant misunderstands the nature of the United States' claim. The specific act to which the United States objects is the importation of the Tusk, not the fact that it was etched in Zimbabwe: "the Defendant tusk was imported into the United States . . . in violation of the ESA." (Compl. ¶ 45; see also id. ¶¶ 50, 59, 64.) The United States would be retroactively applying the definition if it were seeking to seize an item that had been allowed into the United States as a trophy before § 23.74 came into effect. The Tusk, however, was imported in 2009, after § 23.74 had been officially promulgated. (See id. ¶¶ 25-29.) There is no retroactive application of the law in this case.

Claimant also argues that § 23.74 is unconstitutionally vague. (Clt. Mem. at 19-20.) Specifically, Claimant argues that the inclusion within the definition of sport-hunted trophy of any "any taxidermied part, including, but not limited to, a rug or taxidermied head, shoulder or full mount" contradicts the subsequent exclusion of "curios, ornamentation, jewelry, or other utilitarian items." 50 C.F.R. § 23.74(b). Since a rug is meant for either ornamentation or utility, Claimant argues, a would-be importer would have to guess as to whether a rug is excluded from or included in the definition of sport-hunted trophy. (Clt. Mem. at 19-20.)

Claimant has proposed an exacting task for himself. Since he is not facing criminal penalties, and does not explain how the seizure of the Tusk implicates any constitutionally protected conduct, his claim that the regulation is unduly vague can be upheld "only if the enactment is impermissibly vague in all of its applications." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-95 (1982). This court "should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law." Id. at 495. To state this standard is to show that Claimant's vagueness challenge must fail. Claimant claims that a hypothetical importer would be confused about whether a taxidermied specimen, or a specimen turned into a rug, would be permitted or not. (Clt. Mem. at 20.) This may be so, but Defendant Tusk is not a taxidermied specimen or a rug; it has been altered in other ways. Thus, the vagueness that Claimant complains of, even if real, did not impact his actions and therefore he cannot raise it in his defense. See Village of Hoffman., 455 U.S. at n.7.

Finally, Claimant claims that the application of § 23.74 to the Tusk violates the fair notice guarantee of due process. (Clt. Mem. at 22.) The arguments he raises in support of this claim are that the definition does not reference etching, and that the proposed § 23.74 was contained within a larger set of proposed regulations when listed in the Federal Register. (Id.)

21

As the court discussed in Part III.C.1., above, the United States' application of the definition to the Tusk is a reasonable one, and certainly the language of the regulation is sufficient to give Claimant notice that etched items might not be considered hunting trophies. Furthermore, Claimant cites no authority for the proposition that an administrative agency must list only one proposed regulation at a time, and the court has already concluded that the definition was promulgated according to the requirements of the APA. See n. 6, supra. Claimant's notice challenge fails.

          3.     Act of State Doctrine

Despite being raised only obliquely by Claimant, the elephant in the room with regard to the United States' first claim for relief, which alleges that Defendant Tusk did not have a valid export permit from Zimbabwe (see Compl. ¶ X), is the Act of State doctrine. The traditional idea of the Act of State doctrine is that "the courts of one country will not sit in judgment on the acts of the government of another done within its territory." Underhill v. Hernandez, 168 U.S. 250, 252 (1897). The basic rationale for the Act of State doctrine is based on separation of powers—"the strong sense of the judicial branch that its engagement in the task of passing on the validity of foreign acts of a state may hinder rather than further this country's pursuit of goals." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423 (1964). The court raised the possible applicability of the doctrine at oral argument and received supplemental briefing from the United States on the same issue. (Gov't Supplemental Ltr. (Docket Entry # 40) at 2-9.) In that briefing, the United States conceded that its first claim—that Defendant Tusk had been exported without a valid CITES permit from Zimbabwe—implicitly called on the court to determine that Zimbabwe's grant of a permit was invalid. (Id. at 2.) Thus, the court must consider whether the Act of State doctrine bars granting judgment in favor of the United States on its first claim.

The Act of State doctrine has variously been described as a rule of decision, W.S. Kirkpatrick v. Envtl. Tectonics, 493 U.S. 400, 406 (1990), and as a doctrine of abstention, Bigio v. Coca-Cola Co., 239 F.3d 440, 452 & n.7 (2d Cir. 2001). In either formulation, the doctrine does not always prevent a court from doing something that calls into question an official act of another nation. Rather, a court must balance the interests involved and ask itself whether the policies that underlie the doctrine justify the application in the particular case. Id. at 452. This requires a case-by-case analysis of whether separation-of-power concerns are implicated. Id. The court must consider what the impact of the court's decision on international relations will be, and whether it will embarrass or hinder the executive branch's foreign policy. Id.

District courts have held that where the United States brings suit, the policies that underlie the doctrine are not present. See United States v. Giffen, 326 F. Supp. 2d 497, 502 (S.D.N.Y. 2004); United States v. Labs of Va., Inc., 272 F. Supp. 2d 764, 771 (N.D. Ill. 2003). These opinions cohere with the test that Bigio establishes: where the United States Government has brought suit, clearly the court need not worry that it will intrude into an area that the executive branch does not want it, or that the court's action will hinder its administration of its foreign affairs power—because the executive branch itself has made the decision to seek the court's resolution of a claim, and to frame that claim in such a way as to make an issue of the validity of another country's official act.

Another example of when the policy reasons that underlie the Act of State doctrine are not present is when the claim involves a principle of international law that is codified by a "treaty or other unambiguous agreement regarding controlling legal principles." Banco Nacional de Cuba, 376 U.S. at 428. District courts have applied this principle to cases involving CITES; for example, in Labs of Virginia, Inc., 272 F. Supp. 2d at 771, the court held that CITES

23

signatories had voluntarily given up some amount of sovereignty and agreed to a precise set of rules that other nations would be expected to enforce. In that situation, "the existence of a controlling treaty alters the parties' otherwise-unfettered interaction. . . . [C]oncerns of international comity and conduct of foreign relations are minimized because [the signatories] have already agreed . . . on the principles governing their conduct." Id.

In the instant case, the court concludes that the policy concerns which animate the Act of State doctrine are not present. This case has been brought by the United States. The executive branch of the government has sought judicial involvement. Moreover, it presumably has concluded that the enforcement of the conservation regime is more significant than whatever disagreement, if any, this case might create with Zimbabwe. Additionally, this case is premised on enforcement of a treaty, as well as statutory law. Both the United States and Zimbabwe gave up some amount of sovereignty and discretion for a set of shared legal norms by agreeing to CITES. As CITES is to be enforced by all of its member nations, CITES Art. VIIII(1), a signatory cannot be surprised that other signatories nations might enforce its provisions by scrutinizing the permits it has issued. Cf. Labs of Virginia, Inc., 272 F. Supp. 2d at 771. The court concludes that the Act of State doctrine does not foreclose relief in this case.

## IV.    CONCLUSION

For the foregoing reasons, Claimant's motion to dismiss and for summary judgment is

DENIED, and the United States' motion for summary judgment is GRANTED on all claims.

The Tusk is condemned and forfeited to the United States.  The Clerk of Court is directed to

close this case.

SO ORDERED.                                                    s/Nicholas G. Garaufis

Dated: Brooklyn, New York                          NICHOLAS G. GARAUFIS
       May 17, 2012                                      United States District Judge